PETROLEUM IRON WORKS CO. v. BOYLE.

(Circuit Court of Appeals, Sixth Circuit. June 7, 1910.)

No. 2,021.

1. MASTER AND SERVANT (§§ 101, 102, 124*)—MASTER'S LIABILITY FOR INJURY TO SERVANT—MACHINERY AND APPLIANCES—MASTER'S DUTY.

The general rule with respect to the installation and use of a given machine or other article is that an employer discharges his duty of exercising ordinary care to provide a reasonably safe place to work if he buys the machine from a reputable manufacturer, and uses ordinary care in inspecting it before using; and it is also the general rule that, where there is no visible defect in the machine, the purchaser is not negligent in failing to discover defects which were not discoverable by the use of the usual tests, but he is not absolved from the duty of making what is, under the circumstances, a reasonable inspection.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 235–242; Dec. Dig. §§ 101, 102, 124.*]

2. MASTER AND SERVANT (§ 124*)—INSPECTION OF MACHINERY—"EXTERNAL EXAMINATION."

An "external examination," such as a purchaser of a machine or appliance, which is to be used in the place where his employés are to work,

is required to make, is not necessarily limited to the outer surface as distinguished from the inner surface of a valve actually exposed or naturally exposable to view in the process of installation.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 235–242; Dec. Dig. § 124.*]

3. MASTER AND SERVANT (§ 286*)—ACTION FOR INJURY TO SERVANT—QUESTIONS FOR JURY—INSPECTION OF APPLIANCE.

Plaintiff's intestate, an employé in defendant's iron works, was killed by the explosion of a valve in an air compression line, which was structurally defective and unfit, by reason of blowholes in the iron. It was a standard valve, purchased from a reputable dealer, and made by a reputable manufacturer with a guaranty of its sufficiency. It was 12 inches long and 5 inches in diameter, and while the holes were concealed by paint on the outside they could be seen from the inside when the seat was removed, as it was for about an hour while the valve was being installed four weeks before the explosion, but defendant's chief engineer, under whose general direction the installation was made, did not inspect it. The holes were noticed by one of the workmen, but he was unskilled, and did not know that they rendered the valve dangerous. Held, that the court properly submitted to the jury the question whether the defect was a latent one not discoverable by ordinary care, and whether ordinary care under the circumstances required defendant to make at least a visual inspection of the interior of the valve.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1029; Dec. Dig. § 286.*]

In Error to the Circuit Court of the United States for the Northern District of Ohio.

Action by J. J. Boyle, administrator of the estate of Conrad Hoover, deceased, against the Petroleum Iron Works Company. Judgment for plaintiff, and defendant brings error. Affirmed.

The defendant in error, plaintiff below, recovered verdict and judgment against the plaintiff in error (hereinafter called the defendant) for damages on account of the death of plaintiff's decedent caused by the explosion of a valve in an air compression line in defendant's manufacturing plant, in which decedent was a general workman. The facts are these:

For the construction of the compression line in question the defendant's engineers, regularly in its employ, specified a 5-inch Jenkins Bros'. valve, which is the valve in question. Jenkins Bros. were reputable manufacturers of valves for air and steam lines, and the valve in question was a reputable and standard design, and it was bought by defendant's chief engineer of a local and reputable hardware dealer; defendant's engineer knowing at the time that valves of the description so bought were guaranteed by the manufacturers to have a safe working pressure of 150 pounds. The valve was installed under the direction and supervision of defendant's chief engineer, who did not, however, make any examination or inspection of it. When pointed out by the engineer, with directions to the pipe fitters to install it, it was still crated. The valve was 12 inches long, of cast iron pipe, of an interior diameter of 5 inches. It weighed 75 to 80 pounds. There was a globular expansion in the center of the valve on the under side. Upon the top of the valve was a seat or stem fastened to the valve by 8 bolts, and provided with a wheel and screw for opening and closing the gate which divided the valve midway between the two ends. In the installation of the valve the stem or seat was removed, because it was inconvenient to turn the valve with the seat attached. The seat remained off the valve for about one hour during the process of installation, which seems to have occupied more than half a day. While the seat was off, one of the pipe fitters, who was engaged in installing the valve, noticed that the interior surface of the bowl of the valve was punctured with numerous holes of the size of a pin, 50 or 60 of such

holes appearing in a space of about two or three inches square. He did not call the attention of the chief engineer to it, nor did he know that it indicated an unsafe condition, for, although working at the time as a pipe fitter, he was not a practical pipe fitter and was unacquainted with the grades and character of iron. The chief engineer did not actually see the pin holes, nor was his attention called to them, and the evidence does not indicate that he saw the valve while the seat was in fact off. He appeared at the work at intervals of about an hour during its progress. The inside of the valve was unpainted, the outside was painted and no holes were there visible. The line was provided with a pop valve adjusted to blow off at a pressure of 95 to 100 pounds. The valve had been in use for from four to six weeks, at a pressure never exceeding 100 pounds. It exploded under a pressure of 65 to 70 pounds, being blown into from 50 to 100 pieces. Examination after the explosion showed that the bowl of the valve was fairly honeycombed with blow holes or sand holes, ranging in size from that of a pin to a match head, at least one of the holes having a diameter of $\frac{1}{8}$ of an inch, some of them extending nearly, if not quite, to the outer surface, being concealed, however, by the paint. No test, examination, or inspection of the valve was ever made by the defendant, or by any one on its behalf, unless the valve may be said to have been tested from the mere fact of its use from the time of installation to the explosion. Plaintiff's decedent had nothing to do with the installation of the valve. There was no defense that he was contributorily negligent, or that he had assumed the risk in question. The court instructed the jury that the sole cause of the explosion was the defective or weakened condition of the fiber of the iron in the globular part of the valve, due to the blowholes or sand holes. The sole ground of defendant's negligence submitted to the jury was the failure to inspect the interior of the valve before or in connection with its installation. The jury were instructed that the defendant performed its duty in so far as the purchase of the valve was concerned, if it bought the valve of a reputable dealer in reputable valves, and under a guaranty that it should stand a working pressure of 150 pounds; also that the pipe fitter's knowledge was not imputable to the defendant, and that therefore his discovery of the blowholes would not bind the defendant.

The court submitted, however, the question "whether or not the defendant was in the exercise of ordinary care in not inspecting the interior of the valve, notwithstanding the fact that if the valve seat had been taken out it would have discovered blowholes; and whether or not, if such inspection had been made and the blowholes had been seen, they would have been visible to such an extent as to lay upon the defendant the duty of either rejecting it or further inspecting or examining to find out whether the holes were there in sufficient extent of quantity or quality as to be a dangerous thing"—saying:

"What do you say ordinary care required of people in their circumstances, in view of the uses to which this was to be put, considering the confidence that they would have in the vendor of it and the manufacturer, considering such danger as might be apprehended from an explosion of a valve, whether it was likely to explode or not, the number of men that would be about it, the dangers that might result from an explosion if a part hit anybody; in view of all those things and anything that appears in the testimony as to any reasonable habit or custom among such people, what did ordinary care require them to do? They were not required to do things that manufacturers would not ordinarily do, but only what they ordinarily do do. They could not blindly take the valve and not look at it at all. Whatever was obvious, or whatever, by the exercise of reasonable care * * * they ought to do to see whether it was all right or not, it would be their duty to do; and the question here narrows itself down as a practical one to you, as to whether or not ordinary care would require that they should look at the inner surface of the globular part of the valve. * * * What difficulties surrounded any such inspection? In the ordinary course of the operation of installing this valve in the line, would it be likely to be visible?"

And, again, that whether ordinary care required such examination "depends upon the character of the instrumentality, the means that it had at hand of inspection, the knowledge that any persons in its employ would naturally have, perhaps, the naturalness or otherwise of the inside of the valve

being exposed in the ordinary operation of installing it. * * * Whether such inspection as would ordinarily be made of such valve, at such a place, and, if it were required to be done, of the interior of the valve, would disclose such a condition as would arouse suspicion or put them naturally upon inquiry to learn whether or not that condition which was there discerned made the valve dangerous to use. Could it repose completely upon the fact that it had bought of a reputable dealer, and that it was of a reputable make, by a reputable house, or, under the circumstances, was there some additional duty of inspection of the interior?"

The assignments here urged relate to the refusal of the court below to direct a verdict for the defendant, and to the giving of instructions contained substantially in the paragraphs above quoted.

W. B. Stewart, for plaintiff in error.

C. Koonce and T. McNamara, for defendant in error.

Before SEVERENS, WARRINGTON, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge (after stating the facts as above). The considerations necessary to the determination of this case lie within a narrow compass. We shall set aside the plaintiff's contention that the valve in question was of inadequate capacity, by reason especially of the strain to which it was subjected on account of vibration and heat, in addition to the strain due to the mere pressure of the air, for this contention becomes immaterial in view of its elimination from the consideration of the jury. We shall also pass by without decision thereon the plaintiff's further contention that a verdict should have been directed in his favor upon the ground that the knowledge obtained by the pipe fitter of the defective condition of the valve was the knowledge of the defendant. In view of the defendant's concession that the valve was actually structurally defective, and was thus unsuitable for the purpose for which it was intended, we may likewise dismiss, as immaterial to this review, the testimony of an actual test by the manufacturers, as distinguished from the fact of their guaranty. The duty of the defendant to exercise ordinary care in providing the plaintiff a reasonably safe place to work is unquestioned. The testimony supports the conclusion that by reason of the defective condition of the valve at the time of its installation the place provided by the defendant for the plaintiff to work in was not reasonably safe. That the defendant in fact made no inspection or examination of the valve before or in connection with its installation is likewise undisputed. It is also undisputed that the valve in question was a standard and reputable valve, made by a reputable manufacturer, and sold by a reputable hardware dealer under the manufacturer's guaranty that it would safely stand a working pressure of 150 pounds, shown by actual test. It appears by the record that, by reason at least of the paint on the outside of the valve, its defective condition was not apparent from a mere visual inspection of the exterior. The testimony, however, tended to show that a merely visual inspection of the interior of the valve would have disclosed such condition as to at least impose upon the defendant the duty of further examination. The defendant insists, however, that by such purchase from a reputable dealer of a standard valve, made by a reputable manufacturer under a guaranty of its sufficiency,

it, as matter of law, discharged its whole duty toward the plaintiff with respect to the exercise of ordinary care in providing a safe place for the plaintiff to work, and thus was not bound to examine or inspect for any defects not discernible by visual inspection of the outside surface of the valve. Upon the correctness of this contention the case must turn; for if defendant is right in this contention, a verdict should have been directed in its favor.

The general rule with respect to the installation and use of a given machine or other article is that an employer discharges his duty of exercising ordinary care to provide a reasonably safe place to work if he buys the machine from a reputable manufacturer, and uses ordinary care in inspecting it before using. But the question still remains: What measure of inspection does ordinary care require in the case of an article so bought? It is the general rule that where there is no visible defect in a machine the purchaser is not negligent in failing to discover defects which were not discernible by the use of the usual tests. Railway Co. v. Toy, 91 Ill. 474, 33 Am. Rep. 57; Reiss v. New York S. S. Co., 128 N. Y. 103, 28 N. E. 24; Reynolds v. Merchants' Woolen Co., 168 Mass. 501, 503, 47 N. E. 406. Nor is he guilty in failing to discover latent defects which ordinary care would not disclose. Cryder v. Chicago, etc., Ry. Co. (C. C. A., Eighth Circuit) 152 Fed. 417, 81 C. C. A. 559; Westinghouse Elec. & Mfg. Co. v. Heimlich (C. C. A., Sixth Circuit) 127 Fed. 92, 62 C. C. A. 92. With respect to what is ordinary care, it has been held by this court as well as by the Supreme Court that ordinary care does not require the purchaser of a piece of machinery or other article, whether simple or complicated, to tear it to pieces in a search for hidden defects. Westinghouse Elec. & Mfg. Co. v. Heimlich, supra; Richmond & Danville R. R. Co. v. Elliott, 149 U. S. 266, 13 Sup. Ct. 837, 37 L. Ed. 728. The purchaser of an article from a reputable manufacturer is thus justified in assuming, in the absence of anything to the contrary discoverable by ordinary tests, that the article is properly made. But the assumption thus permitted is not absolute in the sense that it absolves from all duty of reasonable inspection, nor in any case does it relieve from an inspection as to defects discernible by superficial examination. Fenney v. York Mfg. Co., 189 Mass. 336, 339, 75 N. E. 733.

In support of its proposition that the facts did not justify an allegation of negligence on its part, defendant relies especially upon the cases of Westinghouse Elec. & Mfg. Co. v. Heimlich, supra, and Richmond & Danville R. R. Co. v. Elliott, supra. Neither of these cases, in our judgment, sustains the broad contention made by defendant. In the Westinghouse Case, which involved an allegation of negligence in the use of a derrick chain purchased by the defendant from a reputable manufacturer, the trial court had charged the jury that it was defendant's duty to test the chain by subjecting it to sufficient weight to determine its actual strength. The court held this instruction error. Judge (now Mr. Justice) Lurton there said:

"The duty of examining for a defect thus discoverable grows out of the fact that the master is chargeable with knowledge of any defect in an ap-

pliance furnished his servant which was discoverable by the exercise of reasonable care.".

The defect in question was said to be:

"One which could not have been discovered by anything short of a test which would develop its existence by putting upon it a greater strain than the chain so defective would stand. In other words, in order to determine whether the iron was in fact crystallized, it was necessary to break or cut into each link, for it was altogether possible that if one link was made from crystallized iron that others were also defective."

It was held that:

"Ordinary care does not require such tests as are appropriate only to the process of manufacture. Nor does it demand that the article should be taken to pieces or subjected to any other test which is not shown to be practically efficient and in ordinary use by careful users."

In that case the chain in question had been many times examined for external evidences of defects, injury, or wear, and there was no reason to apprehend a latent defect. The rule as there stated by Judge Lurton is that "a purchaser of such an article from a reputable manufacturer, with representations as to its tested strength and quality of material, is not responsible for hidden defects, which cannot be discovered by a careful external examination." Railway Company v. Elliott, supra, involved the explosion of a boiler of a locomotive engine. Mr. Justice Brewer there said:

"With regard to the defect in the iron casting, which seems to have been revealed by the explosion, it may be said that it is not necessarily the duty of a purchaser of machinery, whether simple or complicated, to tear it to pieces to see if there be not some latent defect. If he purchases from a manufacturer of recognized standing, he is justified in assuming that in the manufacture proper care was taken, and that proper tests were made of the different parts of the machinery, and that as delivered to him it is in a fair and reasonable condition for use. We do not mean to say that it is never the duty of a purchaser to make tests or examinations of his own, or that he can always and wholly rely upon the assumption that the manufacturer has fully and sufficiently tested. It may be, and doubtless often is, his duty when placing the machine in actual use to subject it to ordinary tests for determining its strength and efficiency." .

The controlling questions, as respects the case before us, are: First, must the defect in question necessarily be held to be a latent defect which ordinary care might not discern? and, second, does the requirement of "careful external examination" only necessarily exclude the duty to take note of the interior surface of a valve actually exposed or readily and naturally exposable to view in the process of installation? We think these questions must be answered in the negative. A latent defect is one which in point of fact is not patent. An "external examination" is not necessarily limited to the outer surface, as distinguishable from the inner surface of an open receptacle. One of the definitions of the term "external," as given by a standard lexicographer, is "Outward; exterior; visible from the outside; hence, capable of being perceived; apparent."

As to the facts: Defendant contends that without removing the valve seat the defective condition of the globular part of the valve was not discoverable. We cannot say that this is necessarily so. The

valve was but 12 inches long and the openings were of a diameter of 5 inches. If the valve gate were closed, the two chambers would be but 5 inches by 6 inches in dimensions. We cannot say, from anything that appears in the record, that the condition testified to by the pipe fitter was not readily discoverable by mere visual inspection, without taking off the seat, and whether the gate was open or closed.

Defendant further contends that the valve came from a reputable manufacturer complete, so that there was no necessity to take it apart in installing it, and that no one representing the defendant knew that it was to be taken apart. The seat was, however, in fact removed because it was inconvenient to make the connection without removing it. We think the jury were at liberty to infer that it would not unnaturally be removed in the process of installation, and that the defendant's engineer might well so expect. Moreover, while the seat was off, the valve was for about an hour open to visual inspection. We cannot say that the jury had no right to infer negligence on the part of defendant's engineer, who was supervising the installation, in failing under such circumstances, to observe the condition of the valve.

It is further contended that the pipe fitter did not testify strongly to seeing the defective condition; that he, at the most, testified to seeing an interiorly rough casting, and that the fitter did not himself think the condition dangerous. But it was proper to submit to the jury whether the condition testified to by the pipe fitter was such, as if seen, or by such inspection as the defendant was bound to make would have appeared, was sufficient to put the defendant upon further examination. The fact that the pipe fitter did not regard the condition as dangerous is not controlling, from the fact, which appears in the statement of the case preceding this opinion, that the fitter was unacquainted with the grades and character of iron.

It is further urged that the evidence does not indicate whether manufacturers using such valves do or do not test them, and that the court erred in referring to what manufacturers "ordinarily do do." It must be remembered, however, that the defense of purchase and guaranty, as relieving from the obligation to make further tests, is made by the defendant, and it cannot well complain that the plaintiff has not shown to what extent such purchase relieves from the duty to inspect.

Finally, it is urged that defendant's negligence is to be determined as of the date of the explosion, and that negligence on that date is not shown, from the fact that the valve had been tested by four weeks' use without accident. Of this contention it is enough to say that if the defendant neglected its duty in respect to the installation of the valve, it had no right to subject its employé to the dangers of a test by actual operation in the place provided for the employé to work.

We think that under the circumstances presented the court did not err in submitting to the jury the question whether the defect in question was a latent defect which ordinary care might not discern, nor whether ordinary care did not require, under the circumstances presented, at least a visual inspection of the interior of the valve. In our opinion the case was submitted to the jury under careful and correct instructions. It follows from the views we have expressed that the

defendant was not entitled to a direction of verdict in its favor, and that the case was properly submitted to the jury.

The judgment is accordingly affirmed.